IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-04-00367-CV

 

Waxahachie Independent 

School District,

 

                                                                      Appellant

 v.

 

Tim Johnson and Ed White,

                                                                      Appellees

 

 

 



From the 40th District Court

Ellis County, Texas

Trial Court No. 68721

 



Opinion



 








          Waxahachie Independent School District
(WISD) files this appeal arguing that the trial court erred in denying its plea
to the jurisdiction under newly-enacted section 101.106(b) because the
plaintiffs, Tim Johnson and Ed White, filed the underlying lawsuit against both
WISD and its employees regarding the same subject matter.  Because we find that
the cause of action against WISD does not involve the same subject matter as
the cause of action against WISD’s employees, we affirm.




Factual and Procedural History

          Tim Johnson and Ed White were employed
by WISD as maintenance coordinators.  In August 2003, Johnson and White
(Appellees) filed a written grievance against certain members of the Board of
Trustees, complaining of harassment, stalking, and micromanagement.  Superintendent
Bobby E. Parker told Appellees that the filing of the grievance “pretty much
sealed [their] fate.”  The next day they were placed on administrative leave,
and five days later their employment was terminated.  Appellees appealed the
termination of their employment through WISD’s administrative procedures. 
Their administrative appeal was denied by the WISD Board of Trustees on
November 11, 2003.

          In October 2003, WISD employees Jerry McLemore
and Charles Tims, acting at Parker’s direction, reported to the local police
that Appellees had accessed the WISD computer network and obtained the social
security numbers of all WISD employees.  Shortly after the Board of Trustees
denied the Appellees’ administrative appeal, Johnson was arrested by the
Waxahachie Police for tampering with government records, a third-degree
felony.  White was arrested and charged with the same offense on December 4.  However,
both Appellees were no-billed by separate grand juries in April 2004.

          In September 2004, Appellees filed
suit against WISD for wrongful termination of their employment and against Parker,
McLemore, and Tims (Defendant Employees) for malicious prosecution.  WISD and
the Defendant Employees filed separate pleas to the jurisdiction.  The
Defendant Employees filed a motion to dismiss and argued that the Appellees had
not exhausted their administrative remedies against the Defendant Employees on
the malicious prosecution claim.  WISD filed a plea to the jurisdiction and argued
that because the Appellees had filed suit against both the school district and
the Defendant Employees, Appellees are barred from filing suit against WISD
under the election of remedies statute of the Texas Tort Claims Act (TTCA).  The
trial court granted the Defendant Employees’ motion and denied WISD’s plea and motion
to reconsider.  The trial court severed the Defendant Employees from WISD and
both parties appealed in separate actions to this Court.

          In this appeal, WISD argues that the
trial court erred in denying its plea to the jurisdiction.

Sovereign Immunity

         Governmental entities are
immune from tort liability under the doctrine of sovereign immunity unless the
legislature has waived immunity.  Dallas County Mental Health &
Mental Retardation v. Bossley, 968 S.W.2d 339, 341 (Tex. 1998).  Sovereign
immunity has two components: immunity from liability and immunity from suit.  Wichita
Falls St. Hosp. v. Taylor, 106 S.W.3d 692, 696 (Tex. 2003).  Immunity from
suit is waived to the extent of liability created by the TTCA.  Tex. Civ. Prac. & Rem. Code Ann §
101.025(a) (Vernon 2005); Tex. Dept. of Parks and Wildlife v. Miranda,
133 S.W.3d 217, 224 (Tex. 2004).  Immunity from suit protects the state from
being sued without its consent.  Texas DOT v. Jones, 8 S.W.3d
636, 638 (Tex. 1999).  Absent the State’s consent to suit, a trial court lacks
subject matter jurisdiction.  See id.  Whether a trial court has subject
matter jurisdiction is a question of law reviewed de novo.  Tex. Nat. Res. Conservation Comm’n v. IT-Davy, 74 S.W.3d 849, 855 (Tex. 2002).

          In a suit against a governmental
entity, the plaintiff must affirmatively demonstrate the court’s jurisdiction
by alleging a valid waiver of immunity and pleading facts showing that the
trial court has jurisdiction.  Miranda, 133 S.W.3d at 226.  When deciding
whether to grant a plea to the jurisdiction, the trial court looks to the
allegations in the petition together with any relevant jurisdictional
evidence.  Bland Indep. Sch. Dist. v. Blue, 34 S.W.3d 547, 555 (Tex. 2000).

          The
substance of WISD’s plea to the jurisdiction involves newly-amended section
101.106 of the Texas Civil Practice and Remedies Code.  Tex. Civ. Prac. & Rem. Code Ann. § 101.106 (Vernon 2005). 
Previously section 101.106, entitled “Employees Not Liable After Settlement or
Judgment” stated:  “A judgment in an action or a settlement of a claim under
this chapter bars any action involving the same subject matter by the claimant
against the employee of the governmental unit whose act or omission gave rise
to the claim.”  Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1,
1985 Tex. Gen. Laws 3305, (amended 2003) (current version at Tex. Civ. Prac. & Rem. Code §
101.106).  In 2003, the Legislature amended section 101.106 to its current
form.  Entitled “Election of Remedies,” section 101.106 is as follows:

(a) The filing of a suit under this chapter
against a governmental unit constitutes an irrevocable election by the
plaintiff and immediately and forever bars any suit or recovery by the
plaintiff against any individual employee of the governmental unit regarding
the same subject matter.

 

(b) The filing of a suit against any employee of
a governmental unit constitutes an irrevocable election by the plaintiff and
immediately and forever bars any suit or recovery by the plaintiff against the
governmental unit regarding the same subject matter unless the governmental
unit consents.

 

(c) The settlement of a claim arising under this
chapter shall immediately and forever bar the claimant from any suit against or
recovery from any employee of the same governmental unit regarding the same
subject matter.

 

(d) A judgment against an employee of a
governmental unit shall immediately and forever bar the party obtaining the
judgment from any suit against or recovery from the governmental unit.

 

(e) If a suit is filed under this chapter
against both a governmental unit and any of its employees, the employees shall
immediately be dismissed on the filing of a motion by the governmental unit.

 

(f) If a suit is filed against an employee of a
governmental unit based on conduct within the general scope of that employee’s
employment and if it could have been brought under this chapter against the
governmental unit, the suit is considered to be against the employee in the
employee's official capacity only.  On the employee’s motion, the suit against
the employee shall be dismissed unless the plaintiff files amended pleadings
dismissing the employee and naming the governmental unit as defendant on or
before the 30th day after the date the motion is filed.

 

Tex. Civ. Prac. &
Rem. Code § 101.106.

          The Legislature amended section 101.106
apparently to force a plaintiff to choose whether he would seek to impose tort
liability on a governmental unit or on governmental employees acting as
individuals outside their official capacity.  See Villasan v.
O’Rourke, 166 S.W. 3d 752, 758, 759-60 (Tex. App.—Beaumont 2005, pet. filed). 
The choice of one immediately and irrevocably bars the plaintiff’s claims
against the other.  Tex. Civ. Prac.
& Rem. Code § 101.106(a)-(d).  A plaintiff unwise in his choices
potentially faces an irrevocable bar against both the governmental entity and
its’ employees.  Id.  The effect of the statute is that a plaintiff is
no longer able to include every potential tortfeasor in a suit, argue alternative
theories of recovery based on the same conduct, and allow a fact finder to decide
which party was the wrongdoer.  See Villasan, 166
S.W.3d at 758.  “The prior statutory language may well have been intended
to yield the same result, but court interpretations have read it otherwise so
long as the plaintiff was willing to sue the parties in the ‘correct’ order.” 
Michael D. Morrison, Texas Tort Law - 2003; It Was a Very _____ Year,
56 Baylor L. Rev. 423, 479-80 (2004).

          Of the few appellate
decisions addressing section 101.106, all involve dismissing the suit against
the governmental employees, specifically section 101.106(e).  This is because
the statute strongly favors dismissal of the governmental employees.  Tex. Civ. Prac. Rem. Code § 101.106(e),
(f).  Upon the motion of either the government or the employees, a plaintiff is
forced to proceed against the government alone in three circumstances: “(1)
when the suit is initially filed against the governmental agency alone; (2)
when the suit is initially filed against both governmental agency and its
employees; and (3) when the suit is initially filed against the government
employee when the employee’s conduct is alleged to have been within his scope
of employment.”  Villasan, 166 S.W.3d at 758.  The decisions have held that
once the government files a motion to dismiss the employees under section
101.106(e), the trial court must grant the motion and dismiss the employees
from the suit.  Villasan, 166 S.W.3d at 761-62; Hernandez v. Duncanville Indep. Sch. Dist., No. 3:04-CV-2028-BH (B), 2005 U.S. Dist. LEXIS 5090 at
**16-18 (N.D. Tex. Mar. 29, 2005) (not designated for publication); Martinez
v. Ctr. for Health Care Servs., No. SA-04-CA-0412-RF, 2005 U.S. Dist. LEXIS 9379 at *6 (W.D. Tex. May 12, 2005) (not designated for publication).

          The present case concerns
the opposite situation.  Instead of
seeking to dismiss the Defendant Employees under section 101.106(e), WISD argues
that 101.106(b) requires the dismissal of Appellees’ case against the
governmental unit.

         Section 101.106(b) states
that the filing of a suit against any employee of a governmental unit forever bars
any suit or recovery against the governmental unit involving the “same subject
matter.”  Because Appellees filed suit against the Defendant Employees for
malicious prosecution, WISD argues that Appellees suit against it for unlawful
termination of their employment should be dismissed under section 101.106(b). 
WISD’s arguments in support of dismissal under section 101.106(b) are twofold:
(1) under section 101.106(b) the capacity in which the Defendant Employees were
sued is irrelevant; and (2) the cause of action against the Defendant Employees
and the cause of action against WISD consist of the same subject matter.

Capacity of Employee
Irrelevant

         First, WISD argues that the
simple act of filing a suit against a governmental employee automatically bars
a suit against the governmental unit, irrespective of whether the suit is filed
against the employee in his official capacity or in his individual capacity.  WISD
states that it is irrelevant that Appellees sued the Defendant Employees for a
common law claim outside the TTCA.  They reason that because the language
“under this chapter” is omitted from section 101.106(b), the provision is not
restricted to TTCA claims alone, but applies to any common law tort claim
brought against a governmental employee.  Nor, WISD argues, does it matter that
Appellees sued the Defendant Employees in their individual capacity because section
101.106(b) does not distinguish between suits filed against government
employees in their official capacity and those filed against employees in their
individual capacities.  Therefore, WISD argues it is irrelevant that Appellees
filed the lawsuit against the Defendant Employees, either as individuals or in
their official capacity, because in either instance the lawsuit against WISD is
still barred.

          Because amended section 101.106
contains similar language to that of former section 101.106, we look to
previous interpretations of former section 101.106 for our analysis.  See
Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. Gen.
Laws 3305, (amended 2003) (current version at Tex.
Civ. Prac. & Rem. Code § 101.106).  While the former statute did not
address it, interpretations of former section 101.106 did not differentiate
between whether the government employee was sued in his official or individual
capacity in order to determine whether the statute’s bar applied.  “Whether the
plaintiff’s claim against the governmental unit falls under the TTCA is
relevant, but whether the plaintiff’s claim against the employee falls under
the TTCA is not.”  Hallmark v. City of Fredericksburg, 94 S.W.3d 703,
710 (Tex. App.—San Antonio 2002, pet. denied) (citing Brand v. Savage,
920 S.W.2d 672, 674-75 (Tex. App.—Houston [1st Dist.] 1995, no writ)).  This is
because the purpose of former section 101.106 was to protect government
employees from individual liability when a claim based upon the same facts is
also made against their government employers under the TTCA.  Hallmark,
94 S.W.3d at 710 (citing Gonzalez v. El Paso Hosp. Dist., 940 S.W.2d
793, 795 (Tex. App.—El Paso 1997, no writ)).

          The current version of amended-statute
section 101.106(b) also does not differentiate between an employee in his official
or individual capacity, and a deeper analysis reveals why this is so.  Tex. Civ. Prac. & Rem. Code §
101.106.  Filing a suit against an employee in his official capacity is “an
attempt to impose liability on the State.”  Tex. Parks and Wildlife Dept. v.
E.E. Lowrey Realty, Ltd., 155 S.W.3d 456, 458 (Tex. App.—Waco 2004, pet.
filed) (citing Vela v. Rocha, 52 S.W.3d 398, 403 (Tex. App.—Corpus
Christi 2001, no pet.)).  And so, if an employee sued in his official capacity
files a motion under section 101.106(f), and the plaintiff dismisses the
employee and amends his petition to name the governmental unit, then the suit
is considered as a suit against the governmental unit.  Tex. Civ. Prac. & Rem. Code § 101.106(f).  However, if
the employee makes no such motion, then the government is protected by the irrevocable
bar of section 101.106(b).  Tex. Civ.
Prac. & Rem. Code § 101.106(b).  It is precisely because section
101.106(b) does not address the capacity of the employee, that subsection (b) applies
to employees sued in their official capacity who fail to file a motion under
section 101.106(f).  Tex. Civ. Prac.
& Rem. Code § 101.106(b), (f).

          Similarly, because section 101.106(b)
omits “under this chapter” it also applies to employees sued in their individual
capacities, as employees sued in this capacity are usually sued under the common
law.  See McGowen v. Huang, 120 S.W.3d 452, 459 (Tex. App.—Texarkana
2003, pet. denied).  The governmental unit is protected under both situations. 
Therefore, construing section 101.106 in the “plain and common meaning of the
statute’s words,” the absence of a reference to “under this chapter” or to the
capacity under which the employee is sued is intentional.  Computek Computer
& Office Supplies, Inc. v. Walton, 156 S.W.3d 217, 223 (Tex. App.—Dallas 2005, no pet.) (quoting LaPorte v. Barfield, 898 S.W.2d 288, 292 (Tex. 1995)); Villasan, 2005 Tex. App. LEXIS 4022 at *19.  Accordingly, we agree with
WISD that under section 101.106(b) whether the Defendant Employees were sued in
their official or individual capacities is irrelevant.

Same Subject Matter

         WISD also argues that the
lawsuit against WISD and the Defendant Employees involves the same subject
matter, as required by the statute.  Tex.
Civ. Prac. & Rem. Code § 101.106(b).  WISD states that the subject
matter of the lawsuit was the unlawful termination of the Appellees employment,
and the malicious prosecution claim against the Defendant Employees is connected
with the Appellees unlawful termination claim.  WISD states that, but for the
Defendant Employees actions which ultimately led to the termination of
Appellees’ employment, there would be no cause of action against WISD.  Thus,
WISD argues that the actions and occurrences between Appellees, WISD, and the
Defendant Employees are so inextricably intertwined that they cannot be
separated.  Therefore, WISD contends that Appellees’ claim against WISD is
forever barred.

         Again we look to previous
interpretations of former section 101.106 for our analysis.  See Act of
May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. Gen. Laws
3305, (amended 2003) (current version at Tex.
Civ. Prac. & Rem. Code § 101.106).  Under the former statute, whether
suits against the government and its employees were based on the same cause of
action was irrelevant.  Bossley, 968 S.W.2d at 343.  The relevant
inquiry was whether the two causes of action involved the same subject matter. 
 Id.; Newman v. Obersteller, 960 S.W.2d 621, 622 (Tex. 1997); Beasley v. Clark, 986 S.W.2d 256, 257 (Tex. App.—Houston [1st Dist.]
1998, no pet.); McGowen, 120 S.W.3d at 459.  In previous cases, “same
subject matter” is defined as “arising out of the same actions, transactions,
or occurrences.”  Bossley, 968 S.W.2d at 343; Newman, 960 S.W.2d
at 622.  Other courts use the factors of res judicata as relevant in
determining same subject matter.  See McGowen, 120 S.W.3d at 459.  Under
the doctrine of res judicata, determining whether suits involve the same
transaction are based on a consideration of “whether the facts are related in
time, space, origin, or motivation, whether they form a convenient trial unit,
and whether their treatment as a trial unit conforms to the parties’
expectations or business understanding or usage.”  Sanders v. Blockbuster,
Inc., 127 S.W.3d 382, 386 (Tex. App.—Beaumont 2004, pet. denied) (quoting
Restatement (second) of Judgments § 24(2)); McGowen, 120 S.W.3d at 459
(citing Barr v. Resolution Trust Corp., 837 S.W.2d 627, 631 (Tex. 1992)).

          Appellees argue that the suit against
WISD and the Defendant Employees involves two different set of facts: those
involving their unlawful termination and those involving their malicious
prosecution.  We agree.

          The Defendant Employees reported
Appellees alleged theft to the police two months after Appellees’ employment
had been terminated.  WISD claims that the two causes of action are intertwined
because the actions of the Defendant Employees led to the Appellees’
termination, and because the accusations against the Appellees were well known
to those on the Board the day the Board rejected Appellees appeal.  However,
Appellees state that on the day their administrative appeal was denied, they
were unaware that the Defendant Employees had accused them of wrongdoing, much
less reported their suspicions to the police.  Appellees’ administrative appeal
was denied shortly before they were arrested.  Also, the actual termination of
their employment, the subject of their complaint against WISD, and the facts
leading up to their termination, occurred nearly four months before they were
arrested.  The filing of a grievance claim by Appellees and the subsequent termination
of their employment by WISD in alleged retaliation for filing the grievance are
the actions that led to the filing of the unlawful termination claim.  The alleged
false accusations of criminal conduct made to the police and the subsequent
arrest of Appellees, none of which occurred before or contributed to the
termination of the Appellees’ employment four months prior, are the facts that
led to the filing of the malicious prosecution claim.

          WISD also argues that Appellees
petition is proof that the two causes of action consist of the same subject
matter because the lawsuit was brought against both WISD and the Defendant
Employees and the Appellees in their petition seek to recover from “Defendants,
jointly and severally” in their prayer for relief.  Though both causes of
action are brought in the same lawsuit, Appellees state that this was for the
purpose of judicial economy.  The facts for each cause of action were separated
into different paragraphs in their petition and included in the separate
paragraphs was a specific request for damages from each defendant.

          We find that the facts giving rise to
the different causes of action are sufficiently separated by time and place and
do not arise out of the same transactions or occurrences so as to constitute different
subject matters under section 101.106(b).  See Bossley, 968 S.W.2d at
343; McGowen, 120 S.W.3d at 459.  Therefore, 101.106(b) does not apply
to WISD as a means by which it should be dismissed from Appellees’ lawsuit. 
The trial court did not err in denying WISD’s plea to the jurisdiction. 
Accordingly, we overrule WISD’s only issue.

Conclusion

          Having overruled WISD’s only issue, we
affirm the judgment of the trial court.

 

                                                                   FELIPE REYNA

                                                                   Justice

Before Chief Justice
Gray,

          Justice
Vance, and

          Justice Reyna

          (Chief
Justice Gray dissents with a note:  By a separate order issued November 23,
2005, the Appellant’s motion for rehearing is being denied by a majority of the
justices who participated in the original decision of this appeal.  But the
motion for rehearing pointed out sufficient problems with the opinion
originally issued on September 7, 2005, that the opinion and judgment of that
date are being withdrawn and the majority’s new opinion and judgment dated
November 23, 2005, are substituted for them.  My dissenting opinion dated
September 7, 2005, is not withdrawn but will be reissued on November 23, 2005. 
For a further discussion of the problems being created by the explosion of
withdrawals and substituted opinions, see Kelly v. Gaines, No.
10-03-00369-CV, 2005 Tex. App. LEXIS 9628 (Tex. App.—Waco Nov. 16, 2005)(Gray,
C.J., concurring and dissenting).

Affirmed

Opinion delivered and
filed November 23, 2005

[CV06]






:.5in;line-height:200%'>Dixon
and Hulsey v. State, 211
S.W.3d 853 (Tex. App.—Waco 2006, no pet.) also shed some light on this
issue.  In Dixon, the victim did
not testify about one distinct, detailed incident, but “described the manner in
which appellant sexually assaulted her and said that it occurred numerous
times.”  Dixon, 201 S.W.3d at 734.  Specifically, the victim “related a
sequence of events that occurred every time appellant sexually assaulted her.” 
 Id. at 732.  Dixon would undress, remove the victim’s underwear, touch
her “private parts” with his hand, and touch her “private parts” with his
“private parts.”  Id.  This occurred one hundred times and, with one
exception, always occurred at night.  Id.  The victim provided no other
details.  Id.  Thus, “all
of the incidents presented in the case were presented with equal specificity,
and, except for the fact that one incident occurred during the day, none of the
incidents were distinguished in any manner from each other.”  Id. at 734.  The Court of Criminal Appeals found “beyond a reasonable doubt that the
error in failing to require an election did not contribute to appellant’s
conviction or punishment.”  Id. at 736.

In Hulsey, a jury convicted Hulsey of two counts of sexual
assault, seven counts of indecency with a child by contact, and one count of
indecency with a child by exposure.  See Hulsey,
211 S.W.3d at 855.  Latoya testified
that when she was twelve or thirteen, Hulsey began getting in bed with her and
would lie next to her.  Id. at 856.  He eventually began rubbing her breasts and genitals.  Id.  He did this every morning that he could when Latoya’s mother was at work, more
than ten times and so many times that she could not remember how many.  Id.  Hulsey began having intercourse with Latoya when she was approximately
fifteen.  Id.  Over about a two-year period, Hulsey sexually assaulted
her more than fifty times and that the number may have been one hundred times,
which is what she had told police.  Id.  Latoya’s two sisters also saw
Hulsey on top of Latoya.  Id.  Latoya did not testify to specific
instances of sexual assaults or indecency.  Id. at 855.

The trial court denied Hulsey’s motion to require
the State to elect.  Id.  Hulsey argued that this denial was error
as to two counts of sexual assault and two counts of indecency by contact.  Id.  As to the two counts of indecency by contact with Latoya’s genitals and breast,
we found, beyond a reasonable doubt, that the trial court’s failure to require
the State to elect did not contribute to Hulsey’s conviction or punishment
because Latoya related a sequence of events that occurred every time Hulsey
assaulted her and provided no other details.  Id. at 856 (citing Dixon, 201 S.W.3d at 734-36).  As to the two counts of sexual assault, a specific
incident had been identified for each count; thus, it would have been clear as
to which incidents the State was relying on for conviction.  Id. at 857
(citing Phillips, 130 S.W.3d at 355).    

Unlike the victims in Phillips and Farr,
Brenda did not testify in detail
about any specific incidents of charged conduct.  Thus, the jurors were not
given a choice of incidents from which to choose for conviction on each charged
offense.  Neither was Brenda’s testimony as general as that of the victim in Farr. 
In Farr, K.R. merely testified that the particular offense occurred
“every chance [Farr] got,” that they were alone during the offense, and that the
offenses did not occur during the incidents of oral sex.   Here, as to each
offense, Brenda identified how the offenses occurred, the school year during
which the offenses occurred, where the offenses occurred, what time of day the
offenses occurred, and how often the offenses occurred.  She also provided some
details of what took place during each offense.

Like the victims in Dixon and Hulsey,
Brenda described a sequence of events that occurred each time Jackson committed
a particular offense.  See Dixon, 201 S.W.3d at 732; see also
Hulsey, 211 S.W.3d at 856.  All the incidents for each offense were presented
with equal specificity and, except for the fact that the offenses occurred in
different locations in or around the home or their property, none of the
incidents were distinguished in any manner from each other.  See Dixon, 201 S.W.3d at 734.

Moreover, the unanimity requirement was emphasized
during trial.  In closing, defense counsel reminded the jury that: (1) the
evidence consists of “assaults or indecencies going on over a long period of
time”; (2) “before you can convict Amos [Jackson] of any one of these you’ve
got to unanimously agree that the State has proved one transaction, one event,
beyond a reasonable doubt”; (3) “if the case has been proven on any of these, you’ve
got to agree on one event”; and (4) “you’ve got to agree on a specific event,
that all of the elements of that particular charge are proved beyond a
reasonable doubt on that particular case.”  In its jury charge, the trial court
instructed the jury that before “reaching a verdict of guilty under any
individual indictment tried in this trial, the jury must agree that all of the
elements charged in the individual indictment under consideration occurred in a
single incident in the manner alleged in that individual indictment.”  We cannot say that Jackson was deprived of a
unanimous verdict.  See Dixon, 201 S.W.3d at 735; see
also Hulsey, 211 S.W.3d at 856.  

Neither can we say that Jackson was deprived of
notice or an opportunity to defend against the particular offenses on which the
State intended to rely for conviction.  Other than the locations in the home
where the offenses occurred, there was no distinction between Brenda’s account
of each offense.  See Dixon, 201 S.W.3d at 736.  Jackson was
not deprived of notice or an opportunity to defend.     

In summary, we find, beyond a reasonable doubt,
that the trial court’s failure to force the State to make an election did not
contribute to Jackson’s conviction or punishment.  See Dixon, 201 S.W.3d at 734-36;
see also Hulsey, 211 S.W.3d at 856.  We overrule Jackson’s first issue.

MOTION TO QUASH

            Jackson’s second issue challenges the
denial of his motion to quash the indictments.  We review a trial court’s ruling on a motion to quash an indictment
for abuse of discretion.  State v.
Flournoy, 187 S.W.3d 621, 623 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

            Each indictment charged Jackson with committing an offense that occurred “on or about” a specific date.  Jackson filed a motion to quash the indictments on grounds that each offense was alleged to
have occurred more than once and “it is impossible to know which of the
multiple offenses was the actual offense authorized by the Grand Jury for
prosecution.”  The trial court denied the motion.  On appeal, Jackson contends
that he could not “determine that the offense for which he was convicted was
the very same event or set of facts indicted by the Grand Jury and that at
least nine members of the Grand Jury returning this indictment agreed upon the
same set of facts.”

In Weatherby
v. State, 61 S.W.3d
733 (Tex. App.—Fort Worth 2001, pet. ref’d), Weatherby was charged with
two counts of aggravated sexual assault of a child.  See Weatherby, 61 S.W.3d
at 735.  The first count alleged, “on or about December 24, 1998, aggravated
sexual assault of S.W. by contact of her sexual organ to the mouth or sexual
organ of appellant.”  Id.  The second count alleged indecency with a
child by contact of her breast or genitals, but the jury charge submitted this
count as a lesser included offense of aggravated sexual assault.  Id.  The trial court denied Weatherby’s motion to quash the indictment.  Id.  On appeal, Weatherby argued that “there was no way of knowing whether the grand jury
indicted him on the same facts presented to the petit jury at trial” because the
indictment did not (1) “specifically allege the incident that he was going to
be tried for”; or (2) “specify the acts constituting the alleged offenses.”  Id.  The Fort Worth Court noted that the “indictment tracked the language of the
respective statutes” and that, pretrial, the State had elected a primary
offense.  Id. at 736.  The trial court had “specifically asked the
prosecutor whether that was the offense presented to the grand jury and the
prosecutor responded that there was no evidence to the contrary.”  Id.  Because there was no evidence that the “offenses presented to the grand jury
differed from the offenses proved at trial, the trial court did not abuse its
discretion.”  Id. (citing Sledge v. State, 953 S.W.2d 253, 256 (Tex. Crim.
App. 1997)).

In Sledge, the indictment charged Sledge
with “aggravated sexual assault and indecency with a child, alleging that the
offenses occurred on or about August 31, 1988.”  Sledge, 953 S.W.2d at
254.  Sledge filed a motion requesting notice of extraneous offenses.  Id.  In its response, the State listed “several instances of sexual abuse” and at
the pre-trial hearing, the “State revealed that the conduct of appellant
towards the victim had been continuous over several years.”  Id.  At
Sledge’s request, the State elected to “proceed on two specifically described
episodes which occurred when the child was ten and eleven, because those
incidents were most clear in her mind.”  Id.  On appeal, Sledge argued
that “the question is whether the State may obtain a conviction by proof of a
different act from the act upon which the grand jury indicted - - indeed by
proof of an act which the State has labeled ‘extraneous.’”  Id. at 254. 
However, there was “no evidence that the testimony presented to the grand jury
related to offenses other than those proven at trial.”  Id. at 256.

Although the State made elections in both Weatherby
and Sledge, but no elections were made in this case, Brenda did not
testify to any specific incidents from which the grand jurors could choose.  There
is simply no evidence that the “offenses presented to the grand jury differed
from the offenses proved at trial.”  Weatherby, 61 S.W.3d
at 736; see Sledge, 953 S.W.2d at 256.  The trial court did not abuse
its discretion by denying Jackson’s motions to quash.  See Weatherby,
61 S.W.3d at 736; see also Sledge,
953 S.W.2d at 256.  We overrule Jackson’s second issue.

ABILITY TO HEAR THE EVIDENCE AND CONFRONT
WITNESSES

            In issue three, Jackson contends that
he could not hear the evidence presented at trial or confront the witnesses
against him in violation of article 38.31 of the Code of Criminal Procedure,
the Sixth and Fourteenth Amendments of the United States Constitution, and article
1, section 10 of the Texas Constitution.  

            At trial, Jackson informed the trial
court that he was having difficulty hearing the proceedings.  The trial court
obtained a set of headphones, which Jackson used for the remainder of trial. 
After trial, Jackson filed a motion for new trial, alleging that he was deaf,
could not hear the proceedings, and did not receive “adequate hearing devices,”
thereby depriving him of the rights to “be confronted by his accusers,” “fully
understand the nature of the proceedings,” and “take part in his own defense.”

            At a hearing on the motion, Jackson testified that he has an 82.5 percent hearing loss and completed a sign language
course.  He was not fluent, but could understand sign language when used slowly. 
He received an award for his ability to work despite his inability to hear
without hearing aids.  During voir dire, he could not hear the panel’s responses. 
When using the headphones, he could hear the witnesses, but could not hear the
testimony of the sexual assault nurse examiner when she turned to draw diagrams
on the board, the testimony of witnesses when the microphones went out, or a
video that had been played.  He received headphones on the second day of trial.

            On cross-examination, Jackson told the
prosecutor that he could not hear her, that she needed to speak slowly so he
could read her lips, and that the “high pitch” of her voice caused him to have
trouble hearing.  When asked, Jackson later told the prosecutor, who was using
a microphone, that he could hear her because she was close to him and he was
reading her lips.  He admitted that he had appeared before the trial court
several times before trial, including arraignment and pretrial hearings.  He
claimed that, during his bail hearing, he advised the trial court of his
hearing problems. He had not previously informed the trial court of his 82.5
percent hearing loss, but explained that he had not been asked.  Even after
receiving the headphones, he told his attorney that he was having problems
hearing and his attorney expressed his own hearing difficulties.  They informed
the judge who instructed them to tap on the microphones to make them “work
properly.”  He did not tell the trial court of the need for an interpreter, but
explained that he cannot “understand sign very fast.”  Neither did he ask for
any form of writing regarding the witnesses’s testimony.

            On redirect, Jackson stated that his
previous court appearances took place at the bench, which enabled him to read
the judge’s lips.  On re-cross, Jackson stated that he can hear with his
hearing aids when he is “out in the open where there’s not so much of this
bouncing around in a room with background noise.”

The prosecutor testified that for the first time during
a break, Jackson advised the trial court of his hearing problems.  The trial
court offered to search for a hearing device to plug into the sound system. 
Upon return from the break, the trial court told Jackson that he would have to
contact someone to obtain a hearing device.  Defense counsel did not object to
proceeding with voir dire until a device could be obtained.  When the device
was provided, the trial court inquired as to whether Jackson could hear and the
defense confirmed that he could hear fine.  The defense made no other
indications that Jackson was having trouble hearing.  

The trial court placed his own recollection on the
record, which he subsequently detailed in findings of fact and conclusions of
law.  The trial court’s findings of fact state that: (1) before trial, it was
not advised of Jackson’s hearing impairment, testimony regarding an impairment
was not presented, and it was not apparent that Jackson had any difficulty
hearing; (2) in the morning on the first day of trial, defense counsel advised
the trial court that Jackson was having trouble hearing; (3) defense counsel
did not object to proceeding until a hearing device could be obtained; (4)
during lunch, Jackson received a set of headphones attached to an audio device
plugged into the sound system and indicated that “he could hear fine”; (5)
Jackson used the device during the remainder of trial; (6) it was not apparent
that Jackson had any further trouble hearing and there were no additional
objections on the issue; and (7) Jackson “appeared to confer with his attorney
during the trial without difficulty and thus it was not apparent to the Court
that he had difficulty hearing during the rest of the trial.”  

            The trial court’s conclusions of law
state that: (1) the trial court “devised a suitable remedy” to which Jackson
and his counsel agreed; and (2) Jackson was not denied due process, the
opportunity to confront witnesses, the “right to participate in his trial or
the ability to understand the proceedings in his case.”  The trial court denied
 Jackson’s motion.                                       

            On appeal, Jackson argues that he
qualifies as a “deaf person;” thus, the trial court was required to either provide
an interpreter or, if the defendant is unable to understand sign language,
“fashion a remedy suitable to overcome the defendant’s disability.”  Despite
the provided headphones, Jackson maintains that he could not hear “essential
portions” of the trial.  

            A trial court must provide an
interpreter for a deaf person.  See Tex.
Code Crim. Proc. Ann. art. 38.31(a) (Vernon Supp. 2008).  “The statute implements
the constitutional right of confrontation, which includes the right to have
trial proceedings presented in a way that the accused can understand.”  Salazar v. State, 93 S.W.3d 339, 340 (Tex. App.—Texarkana 2002, pet. ref’d).  If the defendant cannot understand sign
language, the trial court must “fashion a remedy suitable to overcome the
defendant’s disability.”  Lincoln v. State,
999 S.W.2d 806, 809 (Tex. App.—Austin
1999, no pet.).  “A defendant’s failure to object or request relief does not waive
his confrontation right if it is otherwise apparent that he cannot hear or
understand the proceedings.”  Id.

In Lincoln, Lincoln argued that the trial court failed to
“make proper accommodations for his hearing impairment,” depriving him of his
right to confront witnesses and right to an interpreter.  See id. at
807.  Lincoln was not deaf, but had
difficulty hearing.  Id. at 809.  During trial, he advised the trial
court of this problem.  Id.  The trial court allowed Lincoln to move or
the “speakers repeated themselves to permit [Lincoln] to hear.”  Id.  Lincoln “did not indicate at the time that these arrangements were
unsatisfactory.”  Id.  He was also “addressed by the court and responded
appropriately, indicating that he heard and understood what was said,” and “twice
took the stand and testified without difficulty.”  Id. at 809-10.  Only
after trial ended did Lincoln tell the trial court that he could not hear much
of the time.  Id. at 810.

Because the trial court observed Lincoln
throughout trial, it was in the “best position to judge the credibility of [Lincoln’s] claim that he did not hear the proceedings.”  Id.  “While the failure of
appellant or his attorney to tell the court earlier that appellant could not
hear the proceedings is not a bar to raising the issue on appeal, it is
relevant to the question whether the district court knew or should have known
that additional remedies were needed.”  Id.  The Austin Court held
that, “[c]onsidering what the district court was told and observed during the
trial, we are not persuaded that the court failed to take constitutionally
adequate steps to assure that [Lincoln] heard and understood the proceedings.” 
 Id.

In Salazar, Salazar complained that “when it became apparent he could not hear the
witnesses because of his hearing impairment, the court was required to provide
him an interpreter or some other means of communication that would permit him
to participate in the proceedings.”  Salazar, 93 S.W.3d at 340.  However, “Salazar
was addressed by the court or by counsel and responded appropriately,
indicating that he heard and understood what was said.”  Id. at 341.  Not
until the victims finished testifying did Salazar tell the trial court that he
could not hear the testimony.  See id.  “Until then the trial judge had
every reason to believe Salazar was able to understand the proceedings and
testimony, and no reason to the contrary.”  Id.  Thus, the trial court “could
not be expected to take action to ensure that the testimony’s content was
effectively communicated to Salazar.”  Id.  Because the trial court was
in the best position to judge the credibility of Salazar’s complaint, the Texarkana Court was “not persuaded [that] the court failed to take constitutionally adequate
steps to ensure Salazar heard and understood the proceedings.”  Id.

Jackson briefly
testified outside the jury’s presence as to proceeding or resting his case. 
His attorney asked to be informed if Jackson could not hear him.  The record
indicates that Jackson did not have difficulty testifying, but responded
appropriately and appeared to hear and understand what was being said.

Jackson had
also appeared before the court on several occasions before trial and never
indicated that he could not hear or understand what was being said.  Once Jackson advised the trial court of his
hearing difficulties, the trial court provided the set of headphones connected
to the sound system.  According to the record, this was done before voir dire. 
The trial court asked the defense if the device satisfied Jackson and counsel
responded that Jackson could hear fine.  He did not indicate either at that
time, or any other time, “that these arrangements were unsatisfactory.”  Lincoln,
999 S.W.2d at 809.  Thus, the trial court
had every reason to believe that Jackson could hear and understand the
proceedings and, without information to the contrary, could not be expected to
take any other action.  Only after trial ended did Jackson inform that trial
court of his 82.5 percent hearing loss or his inability to hear portions of the
proceedings.  His failure to inform the trial court, at an earlier time, that
he could not hear the proceeding, is relevant to the whether the trial court
knew or should have known of Jackson’s need for “additional remedies.”  Id.    

Having observed Jackson throughout trial, the
trial court was in the “best position to judge the credibility of [his] claim
that he did not hear the proceedings.”  The record does not indicate that the trial
court “failed to take constitutionally adequate steps to assure that [Jackson] heard and understood the proceedings.”  Lincoln, 999 S.W.2d at 810; see Salazar, 93 S.W.3d
at 341.  We overrule issue three.




Because we have overruled Jackson’s three issues,
we affirm the judgment in each of the six cases listed above.              


                   

  

FELIPE REYNA

Justice

Before Chief Justice
Gray,

Justice
Vance, and

Justice
Reyna

Affirmed

Opinion delivered and
filed September 3, 2008

Do not publish

[CRPM]

 









[1]               “Brenda Daniels” is a pseudonym.  





[2]               Brenda also testified that, on two
occasions, Jackson made her watch a pornographic film.  When Brenda was in
eighth grade, Jackson attempted to penetrate her vagina with his penis on two
occasions, once in the fall of 2004 and once in April 2005.  Both acts occurred
in Brenda’s bedroom.  She and Jackson were unclothed.  Jackson was not charged
with penetrating Brenda’s sexual organ with his sexual organ.